CANADIAN NORTHERN RY. CO. v. WALKER.

(Circuit Court of Appeals, Eighth Circuit. July 12, 1909.)

No. 2,956.

1. MASTER AND SERVANT (§§ 135, 137*)—METHODS OF OPERATION DISCRETIONARY —REASONABLE SELECTION NOT NEGLIGENCE.

A railroad company, which selects a customary method of operation or construction which is neither palpably unreasonable nor clearly dangerous, owes its servants no duty to adopt a different method, and it is not guilty of negligence for a failure to do so.

Its officers have and must exercise discretion and judgment in the selection of such methods, and their decisions of doubtful questions re-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

[1] No opinion filed.

garding such matters are presumptively right and may not be held to constitute actionable negligence, in the absence of clear proof to that effect.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 271; Dec. Dig. §§ 135, 137.*

Duty of railroad companies to furnish safe appliances, see note to Felton v. Bullard, 37 C. C. A. 8.]

2. MASTER AND SERVANT (§ 111*)—RAILROAD COMPANIES NOT LIABLE FOR NEGLIGENCE OF SHIPPERS IN REMOVING MEANS OF LOADING.

A railroad company is not liable to its servants for the negligence of shippers in their use and removal of instrumentalities for loading and unloading cars which form temporary obstructions to the safe movement of the cars.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 215–217; Dec. Dig. § 111.*]

3. MASTER AND SERVANT (§ 111*)—LEAVING DUTY TO REMOVE MEANS OF LOADING TO SHIPPERS NOT NEGLIGENCE.

A railroad company is not guilty of negligence because it leaves to shippers who use them the duty of removing from its cars necessary instrumentalities for loading or unloading them which form temporary obstructions near them, and to its servants who move the cars the duty to see that loading or unloading is not in progress just before they start the cars.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 215–217; Dec. Dig. § 111.*]

4. MASTER AND SERVANT (§ 278*)—FACTS—CONCLUSION—SAFE PLACE TO WORK.

A railroad company provided a cattle pen, a platform, and means to form a temporary chute from the pen to the door of the car to enable shippers to load stock into the car. A gate which opened from the pen upon the platform formed, when open, one side of this chute and extended to within four or five inches of the car. The company left the duty of loading and unloading their stock and of closing this gate when they had completed their work to the shippers, and the duty to ascertain, just before the cars were started, whether or not any loading or unloading was in progress to the plaintiff. He could not have discharged that duty without learning that the gate was open. He did not discharge that duty. He knew the method of using the gate, and that if it was open it would strike one riding on the ladder on the side of one of the cars toward the gate; but he did not think of the gate, and when he had failed to make his inspection, and the cars started, he rode along on the side of the ladder of one of them until the open gate knocked him off.

*Held,* the company was not guilty of any lack of ordinary care to provide the plaintiff with a reasonably safe place in which to discharge the duties of his employment.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 954–972; Dec. Dig. § 278.*]

(Syllabus by the Court.)

In Error to the Circuit Court of the United States for the District of Minnesota.

Pierce Butler (How, Butler & Mitchell and Clark, Sweatman & McIntyre, on the brief), for plaintiff in error.

Humphrey Barton, for defendant in error.

Before SANBORN and VAN DEVANTER, Circuit Judges, and POLLOCK, District Judge.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

SANBORN, Circuit Judge: At about 11 o'clock on the dark rainy night of August 15, 1907, the plaintiff below, a switchman in the employment of Canadian Northern Railway Company, the defendant below, was knocked off of a ladder on the side of a freight car by the end of an open gate which, when open, formed one of the sides of a cattle chute and when shut closed an opening in a cattle pen in the yards of the company at Winnipeg. He recovered a judgment against the defendant, which his counsel seeks to sustain on the ground that there was substantial evidence that the company failed to furnish a suitable fastening for the gate, and that it did not provide a gateman or make any other provision to close the gate and keep it closed when shippers were not loading or unloading stock, and that for these reasons it failed to exercise ordinary care to furnish the defendant in error with a reasonably safe place in which to work.

The only evidence concerning the fastening was testimony that the company had so placed a strand or hoop of wire upon the post against which the swinging end of the gate shut that this strand could be dropped over the post in that end of the gate in such a way that it would hold the gate closed, and the testimony of one witness who said that this wire would hold the gate when the wind was not blowing, that it was liable to work off the top of the gate post, but that he had never known it to do so. The legal presumption and the proof were therefore that the company provided a strand of wire that would hold the gate closed. The mere opinion of a single witness, who never saw the wire work off the top of the gate post and never knew that it ever did so, that it was liable to do so, constituted no substantial evidence that this fastening was not adequate, or that the company was guilty of any breach of duty here, and no judgment for its negligence can stand upon a foundation so flimsy.

Was the company guilty of any breach of duty to the plaintiff because it furnished no gateman and made no other provision to close the gate and keep it closed when shippers were not loading or unloading their stock? The true answer to this inquiry is conditioned by the facts of the case in hand, and, if we resolve all conflicts in the testimony and all doubtful inferences in favor of the plaintiff, those facts are these: On the north side of a spur track in the company's yard were two cattle chutes and platforms, and west of these a platform for loading general merchandise. Cars were usually placed on this track daily to be unloaded and loaded over these platforms. They were pulled out toward the east once every night between the hours of 10 p. m. and 1 a. m. that they might be attached to a train which departed at 1:15 a. m. Shippers were accustomed to load the cars as late in the night as they could do so and get through their work before the cars were taken away. Hence it became necessary for the servants of the company who took the cars out, and it was their duty, to inspect the cattle chutes and platforms just before they moved the cars in order that they might be certain that no loading or unloading was in progress and that the cars were clear. The accident occurred at the west cattle chute. This chute was upon a platform which extended from a cattle pen to about 10 inches from the car and was upon about the same plane as the floor of the car. Gang or toe planks

were provided to cover the space between the platform and the car which were placed for the cattle to walk upon and were subsequently removed by the shippers. A permanent fence about five feet high reached from the post against which the gate closed to a point about three feet distant from the car, and this fence and loose boards, which were placed by the shippers between it and the car before they loaded or unloaded cattle, formed the east side of the chute, while the gate, when open, extended to within four or five inches of the car and formed its west side. The shippers uniformly placed the loose boards and opened the gate to load and unload their stock and removed the boards and swung the gate out of the way of the cars and closed it after they had completed their work of loading or unloading.

The plaintiff entered the employment of the company as a member of a night crew in this yard on November 24, 1906, and worked there with the exception of four days until the accident on August 15, 1907. In order of their rank those connected with the work in which the plaintiff was engaged were the yardmaster, the foreman, the engineer, the man who followed and coupled and uncoupled the engine, and the fieldman, whose duty it was to inspect the platforms, cattle chutes, and cars just before the latter were taken off this spur track, and to see that no loading or unloading was in progress. At the time of the accident the plaintiff was this fieldman. He had followed the engine in this yard from November until July, had then been foreman, and on the day of the accident one Rice had been made the foreman and he had become the fieldman. He had frequently watched and waited for the shippers when they were loading cars and had seen them, after they finished their loading or unloading, remove the gang planks and the loose boards on the east side of the chute and swing the gate out of the way of the car and tip the toe planks toward it. He knew that different shippers used the gate and planks on different nights to guide stock into the cars, that if the gate was open it would strike one riding past it on the ladder upon the side of a car toward the gate, and that the only way to determine whether or not shippers were loading or unloading stock, and whether or not the side of the train was clear of temporary obstructions therefrom, was to inspect the platforms and the cars just before the latter were started. He testified that when he was foreman he directed some one of his crew, usually the fieldman, to make such an inspection to ascertain whether or not there was any loading or unloading in progress, to see that the car doors were shut, the gang planks out, and everything clear before they started the cars, but that he never instructed him to see whether or not the gate was closed.

On August 13, 1907, two days before this accident, he, then the foreman, and his crew injured a horse by taking the cars out while a shipper was loading them, and the yardmaster rebuked the plaintiff and instructed him to go personally thereafter and see if any stock was being loaded or unloaded before the cars were moved. On the night of the accident the yardmaster told him to help his new foreman as much as he could, and about an hour before the accident his foreman told him to be careful about this inspection. It was the custom for the fieldman to make the inspection, then to shout or sig-

nal to the foreman or some member of the crew to the effect that the train was clear, and for the engineer to start the cars easterly on the spur track upon the receipt of that signal, but not before. There were six or seven cars on the track when the foreman told the plaintiff that they would pull them out, and the plaintiff went to one of the cars near the cattle chute where the accident happened, mounted that car, released a brake, walked along the top of the train, and went down on the north side of one of the cars to the ground at a point west of the westerly cattle chute for the purpose of inspecting the platforms and the cattle chutes to learn whether or not there was any loading or unloading in progress. He testified at one time that the night was so dark that he could not see from the top of the train whether or not loading was proceeding, and at another time that he could have seen whether or not loading was going on, whether or not the car door was open, and whether or not the gate was open by bending down and swinging his lantern over the side of the car. He did not, however, endeavor to pursue the latter course and did not inspect the platforms or the chutes before he descended to the ground. He intended to walk over the platforms and to inspect them with his lantern so that he could be certain that no loading or unloading was proceeding, and after he had done this to give the signal for the engineer to pull the cars off of the spur track. Just as he stepped upon the ground the other members of his crew moved the cars east without waiting for his signal. He pulled himself up on the side ladder of one of the cars. At first he thought that his fellow servants were coupling the engine to the cars, and that they would not take the latter off the spur track; but, as they proceeded, he thought that the foreman must have made the inspection himself; but the thought never occurred to him that the gate might be open, and he rode along the side of the car until he came into collision with it and was knocked off.

The law imposed upon the railroad company the duty to receive and carry stock in its cars at reasonable rates and to furnish to shippers pens, platforms, and cattle chutes, by means of which they could load and unload their cattle with reasonable facility. It imposed upon the shippers the duty to exercise reasonable care to load and unload their stock in such a manner and to so use and leave the means furnished by the company for that purpose that no unnecessary injury would be inflicted upon the company or upon its servants thereby.

A "railroad," including in that term the tracks, platforms, instrumentalities, and equipment furnished by its owners to carry freight and passengers, is a vast machine, and it is at the same time a place for the servants of the company to work. It is the duty of a railroad company to exercise ordinary care to provide and to maintain a reasonably safe machine for this purpose; but the faithful discharge of this duty does not require it to protect its servants against the effects of their own negligence or against the negligence of third parties in the use of this machine and place. On the other hand, it is the duty of the servants to whom the use of such a machine and place is intrusted to exercise ordinary care to so use the machine and place that it may not be rendered dangerous to them, to the company, or to its

customers, by reason of its use.  American Bridge Company v. Seeds, 144 Fed. 605, 611, 75 C. C. A. 407, 413, 11 L. R. A. (N. S.) 1041.

A railroad company is not liable to its servants for the negligence of its shippers or customers, because they are not its servants and it has no power to control or direct them in their acts of loading or unloading their property (Brady v. Chicago Great Western Ry. Co., 52 C. C. A. 48, 55, 114 Fed. 100, 107, 57 L. R. A. 712; Standard Oil Co. v. Parkinson, 82 C. C. A. 29, 30, 152 Fed. 681, 682), because their negligence is not the natural and probable consequence of their use of the railroad or of the instrumentalities furnished to them to enable them to use it (Burt v. Advertiser Newspaper Co., 154 Mass. 238, 247, 28 N. E. 1, 13 L. R. A. 97), and because the danger from their negligence is one of the ordinary risks of the operation of the railroad which the servants of the company assume.

A railroad company is not liable to its servants for their own negligence in the use and the operation of the railroad, because such negligence is a breach of their primary duty to the company and to its customers, the risk of which each employé by his acceptance of the service assumes.

The legal presumption is that this railroad company furnished a reasonably safe place for the defendant in error to work and reasonably safe instrumentalities with which the shippers might load and unload their stock.  There is evidence which tends to prove that the injury in this case was caused either by the negligence of some shipper who left the gate open when he finished his work of loading or unloading stock, or by the act or negligence of some person unknown, or by the negligence of the fellow servants of the plaintiff who started the cars before he had made his inspection and had given them the signal to move them, or by the negligence of the plaintiff himself, who failed to discharge his specific duty to inspect the platforms and chutes before the cars started, and who rode along on the side ladder of one of the cars when he knew, but failed to think, that if the gate was open it would strike him and knock him from the car.  The railroad company is not liable to the plaintiff for any of these breaches of duty.  His counsel, however, argues that the company owed his client the duty to furnish a gateman or to make some other provision to close the gate and to keep it closed when stock was not being loaded or unloaded, and that its failure so to do constituted actionable negligence.  It is common knowledge, however, that the loading and unloading of cars, the use of gang planks, cattle chutes, heavy wagons, and other instrumentalities for this purpose in or so near to freight cars that the movement of the latter during the process would be dangerous to all concerned and the subsequent removal of these instrumentalities after the work of loading or unloading is completed is usually intrusted to the shippers, and that the duty to see that cars thus loaded or unloaded are clear of these temporary but necessary obstructions before they are moved, is ordinarily imposed upon the servants of the railroad company who take the cars from the loading tracks.  The swinging gate provided with a wire hoop to hold it closed away from the cars when shippers were not loading or unloading stock and capable of forming one side of the cattle chute during

the loading or unloading, and the loose boards ·to extend the permanent fence to the car on the other side of the chute were convenient and facile means of making the necessary temporary lane to guide the cattle from the pen ·to the car, and the gate was not more dangerous or less necessary than the loose boards and the gang planks.

Railroad companies have, and they must exercise, necessarily, judgment and discretion in determining the methods of the construction, use, and operation of their railroads, and there is a wide field here where their decisions of doubtful questions in the affirmative or negative cannot be and ought not to be held to disclose any want of ordinary care or any breach of duty. It was as reasonable to believe that ordinary care would be exercised to remove such temporary obstructions by shippers who were pecuniarily interested that their stock or property should not be derailed and injured by them, and that reasonable care would be exercised to see that the cars were clear of such obstructions before they were started by the servants of the company who moved them and were in danger of injury if such obstructions remained too near to the cars, as it was to suppose that such care would be exercised by a gateman or any other person specially assigned to that duty alone. It does not appear from the nature of these acts, and there is no substantial evidence, that the method of loading and unloading and of care for the removal of the accompanying temporary obstructions which this railroad company selected was either unreasonable or specially dangerous. Skilled and experienced railroad operators are more competent than jurors or judges to choose methods of·operating railroads, and when a railroad company, as in this case, has selected and adopted a customary method of loading and unloading its cars and of removing temporary obstructions necessarily used in that work, which is neither palpably unreasonable nor clearly dangerous, it owes its servants no duty to adopt a different method, and it cannot be held guilty of negligence because it has not done so. Little Rock & M. R. Co. v. Barry, 28 C. C. A. 644, 648, 84 Fed. 944, 948, 43 L. R. A. 349; Gilbert v. Burlington, C. R. & N. Ry. Co., 128 Fed. 529, 531, 63 C. C. A. 27, 29.

There was no substantial evidence of any negligence of the railroad company in this case, and its request for an instructed verdict in its favor should have been granted.

· The judgment below must be reversed, accordingly, and the case must be remanded to the court below, with instructions to grant a new trial, and it is so ordered.

VAN DEVANTER, Circuit Judge (concurring). Without assenting to all of the legal propositions set forth in the foregoing opinion, I concur in the judgment of reversal, and this for the reason that the personal testimony of the plaintiff, as also the evidence as a whole, shows conclusively that he contributed to his injury by his own negligence, and therefore is without any right of recovery.