## EVANS v. ELY.

(Circuit Court of Appeals, Third Circuit. May 28, 1926.)

No. 3348.

1. **Principal and agent** ⚖➡190(1)—**To authorize recovery on implied warranty of authority to make a contract as agent, the contract must first be proven.**

To authorize recovery on an implied warranty by defendant of authority to make a contract as agent, the contract itself must first be established.

2. **Corporations** ⚖➡121(5)—**Evidence held not to establish an alleged parol contract, where written contract was not signed.**

Evidence *held* not to establish the making of a completed parol contract for sale of stock, where the negotiations ended by the drawing of a written contract which was signed by plaintiff, but not by the other party named.

3. **Contracts** ⚖➡29—**Making of contract is question for jury, when there is evidence which would support finding of contract.**

The question whether a contract was made is for the jury only when there is evidence of a contract substantial enough to sustain an affirmative finding by the jury.

In Error to the District Court of the United States for the Eastern District of Pennsylvania; Dickinson, Judge.

Action by William Sterling Evans against Van Horn Ely. Judgment for defendant, and plaintiff brings error. Affirmed.

Isaac A. Pennypacker and Henry, Pepper, Bodine & Stokes, all of Philadelphia, Pa., for plaintiff in error.

James Frank Shrader and Gill, Guckes & Shrader, all of Philadelphia, Pa., for defendant in error.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

WOOLLEY, Circuit Judge. This suit is in assumpsit on a breach of an implied warranty. The theory of the action is that the plaintiff orally agreed to sell all the stock of the Home Manufacturing Light & Power Company to the Wilmington & Philadelphia Traction Company, corporations of different states, under a contract made with the defendant, president of the latter corporation, on his representation that he had authority to make the contract; that in fact he made the contract in question without the authority of his corporate principal; that later his principal repudiated it; and that, having induced the plaintiff by this misrepresentation to enter into the contract to his disadvantage, the defendant became personally bound by an im-

plied warranty of his authority and is liable to the plaintiff in damages as though he had made the contract on his own behalf. Williams v. DeSoto Oil Co., 213 F. 194, 129 C. C. A. 538 (C. C. A. 8th); Kent v. Addicks, 126 F. 112, 60 C. C. A. 660 (C. C. A. 3d); Wolff v. Wilson, 28 Pa. Super. Ct. 511; Stiteler v. Ditzenberger, 45 Pa. Super. Ct. 266; Kroeger v. Pitcairn, 101 Pa. 311, 47 Am. Rep. 718. On the cause of action thus stated in the abstract, the learned trial court held that the plaintiff, to prevail, must present evidence on which three fact findings may be made:

(1) The defendant, as agent, made a contract on behalf of the corporation as principal; (2) the defendant represented that he had authority to contract for the corporation; and (3) the principal repudiated the contract made on its behalf because the defendant lacked authority to make it.

Finding no evidence on which to make these necessary findings, the trial court entered a judgment of nonsuit. Whereupon the plaintiff sued out this writ of error.

[1] Admittedly the three elements—a contract, representation by the agent of his authority to make the contract, followed by the principal's repudiation of the contract because of the agent's lack of authority—are necessary to sustain an action on the agent's implied warranty of authority. Although each of these elements was considered and discussed at the trial, and again in this court on review, we are of opinion that the elements of authorization and repudiation are secondary to the element of the existence of a contract and do not arise until the primary fact of making a contract has been established. If there was no contract, obviously the principal could not have repudiated it; and the defendant's representation of authority to enter into a contract that was not made would, of course, raise no liability on his part. We shall, therefore, lay aside all matters of authorization and repudiation until we have found a contract.

We state the matter in this way because throughout the negotiations, pleadings and trial there was a question whether a contract was actually made; and, if made, with whom was it made—whether with the Traction Company or with the defendant?

[2] Shortly stated, what happened was this: The plaintiff owned or controlled all the stock of the Home Company. Having in view two possible purchasers, a Baltimore concern and the Wilmington concern, he entered into negotiations with Thomas W. Wilson, vice president of the Wilmington Company in Wilmington, who all the while was in touch by telephone with Van Horn Ely, president of that company, then in Philadelphia. Negotiations, beginning early one afternoon, were protracted into the night. The parties (of whom there were several present) came to an understanding as to the price to be paid for the shares, when and how payments should be made, what bonded liabilities of the Home Company should remain, what of its liquid assets should be retained by the vendors, what part of the purchase price—$1,000 —should presently be paid—all before it was determined who was the party negotiating for the purchase of the stock. Ely and Wilson represented a group of corporations of which the Wilmington Company was one. The plaintiff did not know and did not care who the purchaser might be. However, we assume on the plaintiff's averment in his statement of claim that the Wilmington Company was contemplated by all the parties as the proposed purchaser. Toward the end of the negotiations it became apparent that the sale could not be made to the Wilmington Company without first obtaining the approval of the Public Service Commission of Maryland, the domicile of the Home Company, and its approval could not be obtained without a delay to which the plaintiff would not consent. It was then proposed that Wilson be nominated purchaser. This, for a reason not important to state, was regarded as impracticable and Ely's name was suggested. Believing they had arrived at an understanding, Wilson set about writing the contract. As he was having difficulty in expressing some of its terms and as it was evident the drafting of the contract would take some time, the several parties adjourned an hour for dinner. On their return Wilson presented to the plaintiff a draft of the proposed contract naming the plaintiff and defendant as parties and containing all that had been agreed upon and (the plaintiff says) one thing more which was in these words:

"The party of the second part (Ely) shall have an opportunity of satisfying itself (sic) through counsel as to all these matters before making the final payment for the property, and if not found satisfactory to the party of the second part all payments heretofore made shall be returned to the party of the second part and this agreement shall become null and void."

The plaintiff at first demurred to this provision as being a matter not agreed upon. Wilson insisted that it was a part of the

terms and, with little more discussion, the plaintiff signed the writing, with the representation that it would on the next day be taken to Ely for his signature.

Ely then had the books of the Home Company examined and, taking the position that the investigation disclosed that the facts with respect to property valuation, gross earnings, and net income were not as represented by the plaintiff, refused to sign the writing.

Subsequently the plaintiff, having disposed of the shares of the Home Company elsewhere at a lower price, brought this action to recover the difference from Ely on, as we have stated, his implied warranty of authority to make an oral contract which the plaintiff says he and Ely made and completed before the writing was drawn and without an intention that it should be submitted to writing.

Was there a contract? Certainly there was none between the plaintiff and the Wilmington Company; first, because there was no evidence of such a contract, and second, because the theory of this action excludes that possibility. Was there a contract between the plaintiff and Ely? Certainly there was no written contract between them for the only writing bearing their names was not signed by Ely. On this writing the plaintiff did not sue; nor, indeed, did he put it in evidence.

Confronted with this situation the plaintiff says that back of this writing he had a completed oral contract with Ely for the purchase of the shares. So here is an anomaly of a writing which by the plaintiff's signature purports to contain the agreement of the parties and an alleged oral contract previously agreed upon, differing in terms from that of the written agreement. However, we must determine whether there was an antecedent completed oral contract, for it is on such a contract the plaintiff has based his cause of action, and we must look for it in what, on first view, appears to be negotiations leading up to the writing which the plaintiff signed.

Everything that transpired before the plaintiff signed the paper bears the mark of negotiations. Step by step the parties agreed first to one term and then to another. Nothing was said about reducing their understanding to writing, yet, evidently, both parties took it for granted that it should be done. When they had come to what they thought was the end of the negotiations, all the parties remained while one of them proceeded to write down the result.

After separating for dinner and on re-turning, Wilson, as we have stated, handed the writing to the plaintiff. Immediately he inquired: "How is Mr. Ely (then absent) going to sign this paper tonight?" thereby indicating a continuance of his previously expressed purpose to close the transaction that day or not at all and also indicating that he contemplated the signatures both of Ely and himself as necessary to making the contract. After discussion as to the difference in terms to which we have adverted, the plaintiff signed the paper, accepted a check of the Wilmington Company for $1,000 drawn against its contingent fund and charged to Ely, and in return gave Wilson his receipt, saying that the check was "payment for this amount as provided in the agreement dated 4-5-23 between W. Sterling Evans and Van Horn Ely"—that being the agreement in writing signed by the plaintiff and not signed by Ely.

We are constrained to find with the learned trial court that, on facts conceded or definitely established, the record discloses no antecedent oral contract between the parties. [3] But the plaintiff urges that the existence of a contract is a matter not for the court but for the jury to decide. That is true only when there is evidence substantial enough, if submitted, to sustain an affirmative finding by the jury. The rule prevailing at one time that any evidence having a tendency to prove a point is enough to require a court to submit that point to the jury was, fifty years ago, denied by the Supreme Court in Commissioners v. Clark, 94 U. S. 278, 284, 24 L. Ed. 59. There the "scintilla" rule is expressly disapproved. In that case and in later cases the degree of proof justifying submission is defined. Carter v. Carusi, 112 U. S. 478, 484, 5 S. Ct. 281, 285, 28 L. Ed. 820; Randall v. B. & O. R. R. Co., 109 U. S. 478, 482, 3 S. Ct. 322, 323, 27 L. Ed. 1003; Smith v. United States, 151 U. S. 50, 55, 14 S. Ct. 234, 235, 38 L. Ed. 67; Sparf v. U. S., 156 U. S. 51, 99, 100, 15 S. Ct. 273, 292, 39 L. Ed. 343; Patton v. T. & P. Ry. Co., 179 U. S. 658, 659, 660, 21 S. Ct. 275, 276, 45 L. Ed. 361; Small Co. v. Lamborn & Co., 267 U. S. 248, 254, 45 S. Ct. 300, 69 L. Ed. 597; reviewed at length in Hardy-Burlingham Mining Co. v. Baker, 10 F.(2d) 277 (C. C. A. 6th). All courts agree that a case should never be submitted and the jury be permitted to act on mere conjecture or even on probabilities. Virginia Co. v. Hawk, 160 F. 348, 87 C. C. A. 300; Richards v. Mulford, 236 F. 677, 150 C. C. A. 9; Copeland v. Hines (C. C. A.) 269 F. 361. To justify submis-

sion of a case there must be evidence from which the jury may draw valid inferences, by which we mean there must be "something of substance and relevant consequence, and not vague, uncertain, or irrelevant matter not carrying the quality of 'proof' or having fitness to induce conviction." Minahan v. Grand Trunk Ry., 138 F. 37, 70 C. C. A. 463 (C. C. A. 6th).

We find "the evidence is so distinctly all one way" (Travelers' Co. v. Randolph, 78 F. 754, 24 C. C. A. 305; Patton v. Railway Co., 179 U. S. 658, 659, 660, 21 S. Ct. 275, 45 L. Ed. 361), and so lacking in substance to justify a finding the other way, that we hold the learned trial court committed no error in refusing to submit the case.

The judgment is affirmed.