**PENNSYLVANIA PULVERIZING CO. v. BUTLER.**

**No. 4861.**

Circuit Court of Appeals, Third Circuit.

Sept. 29, 1932.

Kellogg & Chance, of Jersey City, N. J. (Merritt Lane and Arthur T. Vanderbilt, both of Newark, N. J., and Theodore C. Waters, of Baltimore, Md., of counsel), for appellant Pennsylvania Pulverizing Co.

Samuel Greenstone, of Newark, N. J. (John A. Hartpence and Thomas G. Haight, both of Jersey City, N. J., of counsel), for appellee.

George S. Hobart, of Newark, N. J., amicus curiæ.

Before BUFFINGTON, WOOLLEY, and THOMPSON, Circuit Judges.

WOOLLEY, Circuit Judge.

Pennsylvania Pulverizing Company is engaged in the business of grading and pulverizing sand for commercial purposes. The process, shortly stated, is to dig from a pit free silica sand such as is found on beaches by the sea. A portion of this raw product is sold for building purposes and for use by railroad locomotives and foundries. For practically all other purposes the sand must be converted into its relatively pure crystalline form; therefore the balance is washed

over concentrating tables to eliminate fine particles and impurities. The residue, now pure silica but with quartz particles of different sizes, is, after drying, hoisted in conveyer buckets to the top of an eighty foot tower and dropped on a vibrating screen of a certain mesh. Sand grains which are too large to go through the screen are carried off as tailings; the sand which goes through the first screen but does not go through screens of progressively finer mesh positioned below is sold mainly for the manufacture of glass. That which is not so disposed of is put through airtight revolving pebble mills and ground to a powder which, after sale, is used for the abrading element in many commercial products, among them tooth paste. Although much of the sand movement is in airtight passages, the operations as a whole are very dusty.

Eldred C. Butler had for nearly two years been an employee of the Pulverizing Company. He claimed that, while in its service, he contracted a disease, or perhaps because of uncertainty of the medical profession the ailment may be called a condition, known as silicosis. However termed, it is serious. It arises from exposure to silica dust and is incurable. The symptoms are shortness of breath, limitation of lung and chest expansion, loss of weight and a dry cough. When silica dust is inhaled the particles under ten microns in diameter (a micron is one-twenty-five thousandth of an inch) enter the tiny lung sacs and stay there, setting up an overproduction of fibrosis or scar tissue. These small dust particles do the mischief; the larger or ordinary dust particles are discharged by the respiratory organs.

Stating the duties which in law a master owes his servant and averring that by breach thereof he had, on inhaling uncontrolled silica dust, sustained serious injuries, Butler brought this suit. He specified, very satisfactorily from a pleader's standpoint, four grounds of negligence which we shall state and discuss presently. From a judgment in his favor, the defendant took this appeal.

■ We must, preliminarily, dissipate the atmosphere which beclouds the real issues of the case in order to bring them sharply into view. The plaintiff, at the argument, laid great stress upon the dusty character of the industry in which the defendant is engaged, indicating that it is highly dangerous in that it involves serious and somewhat insidious hazards to health, and implying, without asserting, that the industry is unlawful. Assuming for present purposes that the indus-

try is a dangerous one, yet, even so, there is no evidence that it is unlawful. Like many industries whose products are pulverized materials, such as cement, lime, gypsum, feldspar, barytes, talcum, snuff, and medicinal and dental bases which affect the health or comfort of their operatives, the product of the industry in which the defendant is engaged is impalpable powder—indeed, its product is dust—the manufacture of which is not per se unlawful and the operations are not per se negligent. Therefore, whether this is an industry which, on public or humane grounds, should be abolished is a matter not to be determined by the judicial department of the government and therefore is not here in issue.

There are many questions raised on this appeal. The main and perhaps controlling one is whether the trial court erred in refusing the defendant's motion for a directed verdict for one or more of the reasons there alleged. The first reason was that there is no proof of any one of the four grounds of negligence on the part of the defendant which the plaintiff alleged in his complaint and on which he built his case.

■ The first ground of negligence charged, and assailed as not proved, is (a), that the defendant failed "to use reasonable care to provide the plaintiff with a reasonably safe place to work."

The duty of a master in that regard is, as matter of law, so well established that it does not call for discussion. Burns v. Del. & Atl. Tele. Co., 70 N. J. Law, 745, 59 A. 220, 592, 67 L. R. A. 956. This averment, however, is general and may be passed by in view of the particular averment to the same effect and to which all evidence on the point was directed, that (c), the defendant, in making the place safe for the plaintiff to work, failed "to use reasonable care to provide a proper ventilating system in its plants."

The Pulverizing Company had been in the business of pulverizing sand since 1906. In 1929 it built a new plant at Toms River, New Jersey. Before completing construction, its president, who had long been conversant with the industry and its objectionable operative features, took certain measures bearing on a master's duty to protect his servants by the exercise of reasonable care, to which he testified as follows:

"When we were drawing the plans for this plant, * * * at Toms River, both myself and several of our engineers visited a great many dusty plants all over the eastern part of

the United States. By that I mean east of the Mississippi River. I went as far as St. Louis to see one. I inspected plants in Cleveland and Rochester, New York, in Keene, New Hampshire, down at Irwin, Tennessee, and Sweet Water, Tennessee, all plants I could find where they were handling dusty material, in order to benefit by all of their experience in securing the very best dust collecting and ventilating systems it was possible to secure.

"Then after we had done that and found out what was used elsewhere, coupled with our own experience in other plants, we submitted the preliminary plans of this plant at Toms River to the Cleveland Blower Company of Cleveland, Ohio, and asked them to design and construct the very best dust collecting and ventilating system that was possible to get for that plant at Toms River. They submitted plans for that dust collecting and ventilating system. We adopted those plans and instructed them to go ahead. Those plans were submitted to the Department of Labor at Trenton, Department of Labor of the State of New Jersey, and were approved by the Department at Trenton, New Jersey, and that ventilating and dust collecting system covered the entire plant, where there was any dust at all. It did not apply to parts of the plant where there was no dust. * * *

"We selected the Northern Blower Company because we found they had done a great deal of the work outfitting other plants in the other dusty trades, not only the silica business but in a great many others, lime and gypsum, feldspar, etc. We found they had a great deal of experience and we believed their system was the best system we could obtain for that purpose. * * *

"We installed that completely; the cost of it was pretty heavy, but we installed it as planned, at the start, before the mill was finished. That was fully installed with the working of the mill."

Professor Drinker, Associate Professor of Hygiene at Harvard University, School of Public Health, testifying with reference to the defendant's ventilating system, said, in answer to a question whether or not it was standard in that type of plants: "There is not any real standard. It is fully in keeping with or if not better than the standards in other plants that I saw or in grinding plants in general."

M. E. Eiben, President of the Northern Blower Company, Cleveland, Ohio, which designed and installed the defendant's system, testified that he had installed dust collecting systems all over this country and in foreign countries; indeed, he had made dust collecting his life's work and had done nothing else. He further testified that the dust collecting machine in use at Toms River is of the type approved by the State of New York and is accompanied by certain guarantees as to clean discharge of air. When asked whether or not the equipment which his concern had installed compares in efficiency with dust arresting and dust collecting devices in other silica plants, he answered that it does. To the question: "And is it abreast of the art?" He replied: "It is up to the minute."

Ellwood Driver, Inspector of the New Jersey Labor Department, testified that in December 1930 he visited the plant twice and found it "in excellent condition" and on examining the ventilating apparatus he found it "fine. * * * Good, very good."

Doctor Andrew F. McBride, former Commissioner of Labor of the State of New Jersey, visited the plant in May 1931. Though after the event, his testimony was admitted on a promise by counsel to connect it up. It was to the effect that, as to; the condition of the plant with respect to safety appliances and precautions taken for health of the workers, he "found it to be in very good condition."

John Roach, Deputy Commissioner of Labor of the State of New Jersey, examined the plant in December 1930 and January 1931. In reply to a question with reference to safety appliances, both ventilators and respirators, he said: "I found it satisfactory."

Morton I. Dorfan, Manager of the Dust Collecting Division of the Pangborn Corporation, a member of the National Safety Council of the Sand Blast Hazard Committee of that organization, visited the plant in May 1931. On being asked to tell the court and jury the condition and efficiency of the ventilating system which he found there in operation he answered, without objection: "I would consider that ventilating system, even though it has been built by a competitor of ours, as equal and possibly superior to many I have seen in plants, handling, first of all, the same kind of dust, and other siliceous dusts."

Doctor Henry H. Kessler, Director of the State Occupational Disease Clinic of New Jersey, speaking with reference to the equipment for ventilation at the Toms River plant, said: "From my general knowledge of plants

having dust hazard, I believe the equipment used was satisfactory for the purpose."

Opposed to this testimony for the defendant on the issue of negligence in ventilation, the plaintiff proceeded to prove negligence in this particular by testimony that his work about the plant was in sweeping up the dust, in bagging sand, sometimes directly from the end of the mill, in burlap or tightly woven cloth bags which sometimes would burst, in working at the dryer but mainly (for about a year) in working in the screen tower keeping the vibrating screen from clogging by means of a compressed air gun and a steel brush. Butler testified that to the screen at the top of the tower there ascended through an open shaft a belt conveyer with uncovered buckets of sand, and that, though from buckets and screen the dust was very bad, there was no ventilating system except windows which he was ordered "to keep shut, to keep the sand from blowing off from the belt, going to the screen." And, finally, that Driver and Roach, officials of the New Jersey Labor Department, recommended the use of paper bags in place of fabric bags.

On this evidence the court submitted the case and allowed the jury to find whether the defendant was negligent, because of lack of reasonable care, in failing to install and maintain a proper ventilating system in its plant.

Whether on this evidence the court erred in submitting the case to the jury is a question to be determined not by weighing the evidence for the plaintiff against the evidence for the defendant, since that is not the function of an appellate court, but by subjecting the evidence for the plaintiff alone to the test of several well established rules of law relating to the quality of proof in general and to the character of proof required in this particular kind of a negligence case. The first, which is negative, is that in federal courts the scintilla rule no longer exists; the second, that evidence to be controlling should be substantial enough, if submitted, to sustain an affirmative finding by the jury, Evans v. Ely (C. C. A.) 13 F.(2d) 62, 64; and to be validly submitted it must be "something of substance and relevant consequence, and not vague, uncertain, or irrelevant matter not carrying the quality of 'proof.'" Minahan v. Grand Trunk Railway Company (C. C. A.) 138 F. 37, 46.

The plaintiff's evidence of the defendant's ventilating system might show negligence were it permissible to infer negligence from the fact of the plaintiff's injury, or it might show a spark of evidence of negligence from the fact that the windows in the tower were kept closed. But without more to prove that keeping the windows closed need not, in an orderly manufacturing process, have been done or should not, for the plaintiff's protection, have been done, that evidence, standing alone, is not enough to submit to the jury, or, if submitted, is not enough to sustain an affirmative finding of negligence. It left uncertain and unproved, and therefore left the jury to conjecture, whether the defendant did something it should not have done or failed to do something it should have done. Keeping in mind that the plaintiff charged the defendant with negligence, not in making too much dust or in making more dust than a properly organized plant properly operated would make, but in failing to use reasonable care to provide a proper ventilating system to control the dust it did make, proof of much dust at a particular place without proof that the defendant could and therefore should have provided efficient means to overcome it is not substantial enough to be controlling on the averment that it was negligent in failing "to use reasonable care to provide a proper ventilating system."

Moreover, the plaintiff's evidence of negligence in ventilation must respond to the test of another rule affecting a master's duty to his servant, which is that he is required only to use "reasonable care" in selecting instrumentalities for his protection. On this rule, now established almost everywhere, this court said in Haines v. Spencer, 167 F. 266, 271:

"The employer is not an insurer, and the duty imposed upon him is not to furnish the safest or newest and best machines and appliances, but only to exercise due care to provide those which are reasonably free from danger. [Citations.] And the rule as to this is the usage of the business, negligence not being imputable where the machine in question is that which is generally employed." (Citation.) Tompkins v. Machine Co., 70 N. J. Law, 330, 58 A. 393; Stapleton v. Reading Co. (C. C. A.) 26 F.(2d) 242.

The court, continuing on the question as to how this is to be proved, said:

"It may be that, for the purpose of comparison, it would be admissible, in order to aid the jury in determining what is reasonably safe, to put other machines in evidence, which are in common and ordinary use in

similar establishments." (Citing authorities for and against this procedure.)

▉ Without expressing ourselves upon the procedural part of the rule, it should be noted that, whatever it be, the plaintiff in this case, though recognizing the rule of "reasonable care," assailed the defendant's system of ventilation (as involving negligence) by proof of dust in large quantities here and there, not by proof of other mechanism or means known to the industry or to the science of hygiene by which the dust could be controlled more effectively. So the plaintiff's evidence not only failed to prove (by showing better instrumentalities) that the defendant's ventilating system might have been better but, for the same reason, it stopped short of proving it was not such a system as by the exercise of reasonable care could and should have been furnished. Failing affirmatively to meet this test and failing also to contradict the defendant's evidence as to its exercise of reasonable care in studying the dust problem, endeavoring to solve it, and providing not only "apparatus in common use" but apparatus of superior quality "purchased from a reputable and experienced manufacturer," Bauman v. Cowdin, 75 N. J. Law, 193, 195, 66 A. 914, 915; Id., 76 N. J. Law, 575, 74 A. 1135, the plaintiff's evidence was insubstantial within the rule of Evans v. Ely, supra, and offended the final rule (and test) which forbids the submission of such uncertain evidence from which the jury was permitted to guess and decide, against the practice of the industry and knowledge of the art, what is a proper or improper ventilating system in the industry. Del. L. & W. R. R. Co. v. Koske, 279 U. S. 7, 49 S. Ct. 202, 73 L. Ed. 578; Kilpatrick v. Choctaw, O. & G. R. Co. (C. C. A.) 121 F. 11; Canadian Northern Railway Co. v. Walker (C. C. A.) 172 F. 346, 24 L. R. A. (N. S.) 1020; B. & O. R. R. Co. v. Newell (C. C. A.) 196 F. 866; Lehigh Valley R. R. Co. v. Passinier (C. C. A.) 4 F.(2d) 46.

▉ Another reason in the defendant's motion for a directed verdict (still under consideration) is that the plaintiff did not prove its second averment of negligence in that the defendant (b) failed "to use reasonable care to provide the plaintiff with proper masks or other appliances or safeguards in said work."

The president of the defendant company testified that before starting up the Toms River plant he gave a great deal of study to masks and particularly to the types made by the Willson Company. He visited concerns that purchased these masks, saw them in use in dusty plants, and then adopted them.

Doctor Andrew F. McBride, Commissioner of Labor of the State of New Jersey, testified that the masks which the defendant supplied its servants "were practical and efficient."

John Roach, Deputy Commissioner of Labor of the State of New Jersey, testified that masks of the type in the defendant's plant had been approved by his Department of Labor for use in this type of work.

Harry F. Speer, President of the New Jersey Pulverizing Company, a competitor of the defendant, testified, as did one of the witnesses for the plaintiff, that "air line masks"—another type—were still in an experimental stage. He said that the masks used by the defendant were in his judgment, after thirty years experience in the business, better suited for the purpose.

Doctor Fred Willson, President of the Willson Products Company, Reading, Pennsylvania, a member of the Sand Blast Committee of the National Safety Council and of the Advisory Committee of the Bureau of Standards, said, with respect to the defendant's masks, that they are used generally in dusty trades and are "for all practical shop purposes fully protective." Speaking with reference to the air line or direct pressure mask, he testified: "To the best of my knowledge it had not been used and we wouldn't have recommended it."

Professor Drinker of the School of Public Health, Harvard University, said that the Willson sponge mask used by the defendant is "a little ahead of the standard" and that the air line mask, which is still in an experimental stage, is "just an unsatisfactory piece of equipment for that work, * * * is distinctly impractical, * * * they have not been successful."

The testimony for the plaintiff on the question of masks shows that, entering the defendant's employ in June 1929 and leaving it in February 1931, he was not given a mask for three months after his employment. He was then given masks which were in common use throughout the plant and wore them the remainder of his stay, but contends they were defective because dust particles seeped through the sides and through the sponge, and because the mask can only operate properly with a moist sponge and the sponge could not be kept wet by workmen at the top of the screen tower as the nearest available water was kept at the bottom of the tower. Other witnesses for the plaintiff testified to the same effect; although none contradicted the testimony for the defendant as to its care

and caution in selecting and providing masks. The drift of the plaintiff's testimony was that the defendant should have furnished a better mask, perhaps the air line mask, although the testimony for both plaintiff and defendant was that such a mask, being still in the experimental stage, had not gone into general use in the industry.

Notwithstanding there is testimony for the defendant that masks were supplied all men at the opening of the Toms River plant and continuously thereafter, we shall accept as true the plaintiff's statement that he was not supplied with one until three months after starting work. But we shall regard this statement, in view of the plaintiff's failure even to intimate that the disease developed during that period, as not bearing on the question because, according to the evidence, the disease of silicosis occurs only after exposure to silica for a long time, and that, assuming it later developed, it could not have been set up in the first three months of the twenty months of the plaintiff's employment without being discovered by him before the sixteenth month.

In August 1930, fourteen months after going to work, the plaintiff complained that his mask did not fit and was furnished another. He testified that in October 1930, sixteen months after going to work, he felt pains in his chest and in November felt pretty bad. Several weeks before the end of his employment, he requested that he be furnished with an air line mask in place of the sponge mask which he had been using. The superintendent promised to get him one. Such a mask was obtained and given the plaintiff but, because its valve clogged repeatedly, requiring the man to take off the mask and make adjustments in the dust, it was not satisfactory and could not be adapted to the defendant's plant.

The evidence for the plaintiff as to the defendant's alleged negligence in supplying the kind of masks it did and in not supplying better ones shows the same infirmities as the plaintiff's evidence of negligence in the ventilating system previously discussed. It is controlled by the same rules of law, is subject to substantially the same observations we there made and is, we hold, equally insubstantial. It follows it was error for the trial court to submit this evidence and permit the jury to find from it that the defendant was negligent when it does not show how better, or how else, it could perform its duty of exercising reasonable care in the circumstances.

The fourth and final ground of negligence which the plaintiff charged to the defendant was (d) its failure "to give the plaintiff proper warning, information and knowledge of the dangerous character of its work with the sand silica dust."

There is of course no question of a master's duty in this regard. He must instruct and warn his servant as to dangers of which he knows or ought to know, and of which he knows or ought to know the servant is, from the nature of things, ignorant. Ramsey v. Raritan Copper Works, 78 N. J. Law, 474, 74 A. 437; Rhobovsky v. N. J. Worsted Spinning Company, 76 N. J. Law, 542, 70 A. 170.

It is not clear that the defendant knew precisely what the effect of long exposure to silica dust would be, nor is it at all certain that it is chargeable with pathological knowledge of the subject in view of the uncertainty with respect to the matter prevailing in the medical profession.

One doctor testified:

"There is no knowledge anywhere in the country today of how much exposure is necessary to produce silicosis. Nor is there any accepted standard by which one can tell whether a given set of conditions will or will not produce silicosis."

Another doctor testified:

"There is no expert on silicosis because it is a state of disease that nobody, even those who claim to have experience in the matter, are able at the present time to determine what silicosis is, except they know it is fibrosis of the lung. Beyond fibrosis of the lung they don't know what it is."

At the trial the medical experts divided into two groups on the question whether the plaintiff has silicosis at all.

Yet, unquestionably, the defendant master should have known that there is some danger from constant exposure to dust from ground quartz. Evidently it did know it, and it realized its duty to guard against that danger by providing ventilators and respirators and then by warning its servants. The defendant, speaking through its president, said:

"We always told every man that worked in the mill the danger of the dust. We have always given them without expense to them the most effective mask we could find for that purpose. We have told them they must wear these masks at all times there in the mill on duty. We have shown them how to wear masks, how to adjust them, how to clean the sponges. We have provided facilities for

cleaning the sponges and we have seen that they do wear the masks. * * * The supply of these masks was kept in an accessible place and the employee was permitted to help himself to them."

The foreman of the plant testified that the men uniformly were told that dust was injurious to health and they should wear masks and try to prevent it.

Opposed to this the plaintiff testified that he was not so warned. Yet the fact is, he was supplied with masks and wore them, and the fact remains, not disputed, that the defendant supplied masks generally and instructed the men in their use. The defendant's act of supplying the plaintiff with masks and the plaintiff's observation that it supplied his fellow-workers with them are warnings in themselves for, obviously, a master would not have required his servants to undergo the inconvenience of wearing masks and, indeed, the servants would have refused to wear them, unless there were some reason for their use. We think the real trouble on this issue of warning is that the plaintiff complains that the defendant did not warn him of the pathological effect of inhaling silica dust. This may be true, but it is not certain that the defendant knew or should have known it in time seasonably to warn the plaintiff. We find no evidence on the part of the plaintiff charging the defendant with knowledge of the disease. Nor is there evidence that the disease normally follows contact with silica dust, or what conditions will produce the disease, or how long it takes to develop, or, when developed, what precisely is its character. We find it difficult to believe that an employee of normal intelligence working in dust has to be told that inhaling dust of any kind in large quantities is injurious for, obviously, when he is handed a mask and put to work with other men wearing masks in a place equipped with artificial ventilators, that is a plain enough warning that dust is deleterious. We cannot find, on the plaintiff's showing, substantial evidence that the defendant failed in its duty to give the plaintiff adequate warning of the dangerous character of his occupation.

We are constrained to hold that the learned trial court erred in submitting the case to the jury and in refusing to direct a verdict for the defendant on the ground that the plaintiff had failed to prove by substantial evidence any one of the four allegations of negligence on which he rested his case.

As the decision on this question is dispositive of the case, we shall, without reviewing the other questions, decree that the judgment below be reversed, a venire de novo issue and that any further proceedings had shall be conformable with this opinion.