## VIRGINIA & S. W. RY. CO. v. HAWK.

(Circuit Court of Appeals, Sixth Circuit. March 23, 1908.)

### No. 1,735.

1. RAILROADS—PERSONS ON TRACK—DEATH—STATE STATUTES—ACTIONS.
   Shannon's Code Tenn. § 1574, subd. 4, provides that when any person or other obstruction appears on a railroad the alarm whistle shall be sounded, the brake put down, and every possible means employed to stop the train and prevent an accident. Held that, in order to recover for the death of a person under such act, it must be proved that decedent appeared on the road in front of the engine, as an obstruction thereto, and that the engineer failed to sound the alarm, put down the brakes, and employ every possible means to stop the train and prevent the accident.

**2. SAME—BURDEN OF PROOF.**

The burden of proof of such elements of a right of action under such act is on plaintiff.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 41, Railroads, §§ 1341–1343.]

**3. TRIAL—DIRECTION OF VERDICT—SUBSTANTIAL EVIDENCE.**

In order to entitle plaintiff to go to the jury, he must introduce substantial evidence to establish the elements of his cause of action, which consists of something of substance and relevant consequence, and not mere vague, uncertain, or irrelevant matter, insufficient to induce conviction.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 46, Trial, § 338.]

**4. RAILROADS—PERSONS ON TRACK—DEATH—EVIDENCE—QUESTION FOR JURY.**

In an action against a railroad company for death of plaintiff's intestate under Shannon's Code Tenn. § 1574, subd. 4, providing that when any person or other obstruction appears on the road the alarm whistle should be sounded, the brake put down, and every possible means employed to stop the train and prevent an accident, evidence showing the manner of intestate's death *held* too indefinite and uncertain to justify submission of the case to the jury.

In Error to the Circuit Court of the United States for the Eastern District of Tennessee.

C. J. St. John, for plaintiff in error.
Robert Burrow, for defendant in error.

Before SEVERENS and RICHARDS, Circuit Judges, and COCHRAN, District Judge.

COCHRAN, District Judge. This is an action brought by the defendant in error against the plaintiff in error to recover damages for the alleged wrongful death of the former's intestate, caused by one of defendant's trains. It resulted in a verdict and judgment for $1,000. But one ruling of the lower court is assigned as error, and that is its refusal at the close of all the evidence to give peremptory instruction to find for the defendant.

The action is based on subdivision 4, § 1574, Shannon's Code of Tennessee, which requires that, "when any person, animal, or other obstruction appears upon the road, the alarm whistle shall be sounded, the brake put down, and every possible means employed to stop the train and prevent an accident." In order to a recovery on this statute for the injury or death of a person, two things are essential. One is the person injured or killed must have appeared—i. e., been in sight or view from the engine upon the road in front thereof, and it seems as an obstruction thereto. This is essential in order that a duty may have existed to do the things required by the statute. The other is the engineer must have failed to sound the alarm, put down the brakes, and employ every possible means to stop the train and prevent an accident—i. e., have breached the duty so imposed. The burden is on the plaintiff to show both these things. In order to be entitled to go to the jury he must introduce substantial evidence favoring them. What is meant by "substantial evidence" is thus indicated by Judge Severens in Minahan v. Grand Trunk Western Railway Co., 138 Fed. 37, 70 C. C. A. 463.

"Something of substance and relevant consequence and not vague, uncertain, or irrelevant matter, not carrying the quality of proof, or having fitness to induce conviction."

There was not much, if any, contrariety in the evidence introduced before the jury. It was in substance this: The deceased was 19 years of age. One witness testified that he was tolerably fleshy, weighing 150 or 160 pounds; another, that he was a heavy man, weighing about 170 pounds; and another, that he was big and muscular, a little less than 6 feet high, and thick through the chest and shoulders. The last time that he was seen alive was about 8 o'clock the evening before his death, which occurred on July 14, 1905, in Bristol, Tenn., going up Main street. That place is in the line of defendant's railroad, and it runs from thence in a southeasterly direction to Bluff City, a distance of 11 or 12 miles. He was discovered the next morning at half past 7 o'clock, dead, on defendant's track, about 3½ miles northwest of Bluff City and 7 or 8 miles from Bristol. He was lying between the rails with top and back of his head mashed, and one wrist and one of his legs broken. At that point there is a curve in the track to the right going from Bristol. Towards Bristol from the body was found a pistol lying in the center of the track, and opposite it, about four feet from the track, a hat. According to one of plaintiff's witnesses, the distance from the body to the pistol was a rail or rail and a half, or 30 to 40 feet, but according to the testimony of defendant's section foreman the distance was about 100 feet. According to one of plaintiff's witnesses, where the pistol and hat were, there was on the rail and end of the ties brains, little pieces of skull, and a little blood; according to another one, towards where the body was found, brains were scattered along on the ends of the ties and some on the rail, and according to defendant's superintendent, who reached the scene after the body had been removed from the track to a point on the outside opposite the place where it had lain, the ballast 75 to 100 feet from where the body was lying towards Bristol, and at two or three other points, was torn up; 15 feet from the first place where it was so torn up there was flesh and hair against the side of the rail; 25 feet from there was a pool of blood and brains and hair about the outside rail of the curve; and 25 or 30 feet from there to a point opposite to which the body lay on the outside was a pool of blood, as if the body had lain there for a while, and the body had the appearance of having been rolled. In the deceased's pocket was a broken bottle, and it and his clothes were wet with and smelt of whisky. A train had passed from Bluff City to Bristol, leaving the former place the evening before at 9:45, and one had passed from Bristol to Bluff City that morning, leaving the former place at 4 o'clock, and reaching the place where the decedent was struck at about 4:30 a. m., central time. It was then getting tolerably light and the engine had a first rate headlight. The train was running at a rate of 20 miles an hour, and the engineer was on the inside of the curve and could see about 100 feet ahead. There seems to be no question that this was the train which struck and killed decedent. The engineer testified that he was on the lookout and had his eyes on that particular place because considerable

stock grazed there, and he saw no one, and that at Elizabethton, a point on the road—just how far from the scene of the accident not appearing—in pursuance to a telephone message from the superintendent, he examined the engine carefully, and found no blood or flesh on it. In certain of his answers on cross-examination, he indicated that, in saying that he was on the lookout and saw no one, he may have been speaking from habit, rather than from recollection, but, in another, he said that he remembered distinctly that he was on the lookout at that place on that occasion. The superintendent testified that there was a place under the slats of the pilot where a man could ride and he had seen men riding there—that the distance from the top of the ties to the bottom of the average running pilot was $7\frac{1}{4}$ inches and he had made a test of this pilot, not giving the time, but under similar conditions with a small man, and the pilot struck him a little back of the forehead when his head was against the point thereof and about the middle of the face when the body lay across the track with face toward it, and that in his opinion, if deceased had been struck by the pilot, he would have been mashed all to pieces, and, if his body had gotten under the pilot, it would have been literally ground up and either have hung on the pilot and been dragged along with it or kicked aside.

Was this evidence then sufficient to entitle plaintiff to have this case submitted to the jury? Did any of it tend to a substantial degree to establish that the deceased before he was struck by said train appeared on the road in front of it as an obstruction? It might be thought that if some of it did so tend it is overthrown by the testimony of the engineer that he was on the lookout, and did not see the deceased, and that he shortly afterwards examined the engine and there was no flesh or blood on it, and of the superintendent that the pilot of the engine could not have passed over the deceased without grinding his body up, and the test he made tending to show this. But notwithstanding this, if other of the evidence did so tend, the case was still for the jury. It was for them to weigh the opposing constituents of the evidence and determine which had the greater weight. Jenkins & Reynolds Co. v. Alpena Portland Cement Co., 147 Fed. 641, 77 C. C. A. 625. There was no direct evidence tending to establish said fact. No one ever saw the decedent on the defendant's road at any place alive, much less at the place where his dead body was found, in front of the train that killed him as an obstruction thereto. So far as there was any evidence tending so to do it was purely circumstantial and the only circumstances that can be relied on as having such tendency are the position of the body, pistol and hat, relatively to the track and to each other, the wounds on deceased's body, the location of the brains and blood and the disturbances of the ballast. But no inference can be drawn from these facts that the deceased before he was struck appeared on the road in front of the train that struck him as an obstruction. They have no fitness to induce conviction of such fact. The jury were told that it was the contention of plaintiff that "the circumstances here show that he must necessarily have been on the track or within striking distance, and that to find for plaintiff they would have to be satisfied that the circumstances show that that is the strongest probability

in this case—that it is stronger than any other probability." Their attention was called to other ways, possible, if not probable, in which he may have been killed without appearing on the track as an obstruction, especially if he was drunk, such, for instance, as being caught by the wheels of the engine, being dragged thereunder whilst trying with or without reason to get thereon, or falling from, getting knocked off or attempting to get off the train whilst thereon stealing a ride.

Counsel for defendant in error concedes as possible, but wholly improbable, ways in which he may have been killed, his being under the pilot and falling off, falling from the train, or trying to jump on the train; and a possible way was by his stumbling before the engine or between the cars as the train passed, or possibly even by getting so close thereto as it passed as to be drawn under it by suction. We do not understand the lower court to have been of the opinion that it is legitimate to infer from said circumstances that deceased before he was struck was in such position as to give rise to the duty imposed by the statute in question, but that of all the possible ways in which he may have been killed, this way was the strongest probability, and it left it to the jury to weigh the probabilities presented by the circumstances proven and told them if this way was a stronger probability than any other way, they should find for the plaintiff. But a case should never be left to a jury simply on a question of probabilities with a direction to find in accordance with the greater probability. Probabilities may help out items of evidence from which an inference can be drawn, but cannot take their place. To allow a jury to dispose of a case simply upon a weighing of probabilities is to turn them loose into the field of conjecture, and to have the rights of the parties determined by guess. In his charge to the jury in the case of Snyder v. Mutual Life Ins. Co., Fed. Cas. No. 13,154, Judge Cadwalader said:

"The most improbable things are sometimes true, and the most probable things sometimes don't happen."

In the case of Day v. Boston, etc., R. R., 96 Me. 207, 52 Atl. 771, 90 Am. St. Rep. 335, Judge Emery said:

"Quantitative probability—is only the greater chance. It is not proof, nor even probative evidence of the proposition to be proved. That in one throw of dice there is a quantitative probability, or greater chance, that a less number of spots than sixes will fall uppermost is no evidence whatever that in a given throw such was the actual result. Without something more, the actual result of the throw would still be utterly unknown. The slightest real evidence that sixes did in fact fall uppermost would outweigh all the probability otherwise. * * * However confidently one in his own affairs may base his judgment on mere probability as to a past event, when he assumes the burden of establishing such event as a proposition of fact, as a basis for a judgment of a court, he must adduce evidence other than a majority of chances."

In the case of Patton v. Texas & P. R. Co., 179 U. S. 658, 21 Sup. Ct. 275, 45 L. Ed. 361, Mr. Justice Brewer said:

"And where the testimony leaves the matter uncertain, and shows that any one of half a dozen things may have brought about the injury, for some of which the employer is responsible and for some of which he is not, it is not for the jury to guess between these half a dozen causes and find that the

negligence of the employer was the real cause where there is not satisfactory foundation in the testimony for the conclusion."

It is urged on behalf of defendant in error that the possibility that deceased came to his death by falling off the train whilst stealing a ride either under the pilot or elsewhere on the train, or, by throwing himself under the car for the purpose of taking his own life is removed from the case by the presumption against misconduct on the part of any individual. It seems to be a criminal offense in Tennessee for one to steal a ride on a train. But one who walks on the track of a railroad is guilty of misconduct. He is a trespasser, and not in the exercise of due care. There is no reason why there should not be a presumption against such misconduct as well as against other kinds thereof. Our attention has been called to several cases that have arisen under the statute, as having a bearing on the question we have here. They are the cases of Knoxville, C., G. & T. R. Co. v. Wyrick, 99 Tenn. 500, 42 S. W. 434; Felton v. Newport, 105 Fed. 332, 44 C. C. A. 530; Hackney v. C., N. O. & T. P. Ry. Co. (Tenn.) in which no opinion was filed.

In the Wyrick Case, the issue was whether the deceased had appeared as an obstruction upon the track in front of the train, or either fell from the train while stealing a ride, or met his death while attempting to board the train in motion. He had stolen a ride on a freight train from Luttrell Station to Maloneyville, where he was ejected therefrom. In a short time this train was followed by a second section thereof. After it had proceeded about a mile from Maloneyville, it was stopped and the remains of the deceased were found bruised and mangled lying on the track some 15 or 20 feet in the rear of the train. The body had been partially denuded of its clothing and there were signs on the roadbed that it had been dragged. In this case there was no claim that it was not for the jury, and the circumstances stated were not all the evidence having a bearing on the question as to how he came to his death. It was shown that the deceased after he was ejected from the first section of the train walked forward along the track in the direction in which he was afterwards found and along which he was shortly afterwards followed by the second section. This fact in connection with the mangled remains and the signs on the roadbed that the body had been dragged might well be deemed sufficient to require a submission to the jury. Here, the deceased was never seen on the track alive, his remains were not mangled, and there were no signs on the roadbed that the body had been dragged.

In the Newport Case which was regarded as controlling by the lower court, it is clear that it was considered that it was a close question whether it was one for the jury. Judge Severens in his opinion stated that the court "had some doubts from the beginning whether the facts and circumstances disclosed by the evidence were such as to remove the case from the region of mere conjecture as to how the accident occurred, and particularly whether it was shown with sufficient certainty that Newport, the deceased, appeared upon the road as an obstruction within the meaning of subdivision 4, § 1574, Shannon's Code." There, the deceased had left the depot at Helenwood at

8:30 or 9 p. m., going north on the track in an intoxicated condition. As said in C., N. O. & T. P. Ry. Co. v. Davis, 127 Fed. 933, 62 C. C. A. 565: "He had left the station, walking upon the track." He was found dead on the track about 500 feet north of the depot the next morning about 6 o'clock. Between the time he was last seen alive, and his dead body was discovered, six trains had passed over the track where it lay, the first three of which went north and the next three south. It was the first train going north that probably struck him. The body was mangled, and was recovered in pieces. Of course, in view of the number of trains that had passed this circumstance was of no help in determining how he met his death. It is said that "perhaps the probabilities favored the conclusion that Newport had laid down upon the track intoxicated, and was struck in that place and condition." A circumstance existed, however, that had some tendency to show that he was detained there against his will. That circumstance was that one of his feet was found drawn fast into the frog of a switch opening to the south. From this it might be inferred that he had been caught in the switch. But it is urged that this could not have been so as he was going north and the switch opened to the south. It seems to us that there would have been less likelihood of his foot having been so caught had it opened the same way he was going than opening in the opposite direction as it did. It is possible that the force of one or more of the trains passing over him caused it to wedge in tighter than it otherwise would. This case then had these two facts which are not in this case, to wit, the deceased had been seen not a great while before the arrival of the train that struck him walking on the track and his foot was found drawn fast in the frog.

These two cases then, Wyrick and Newport, had circumstances existing before and after the deceased was struck tending to show that he appeared on the track as an obstruction in front of the train that struck him. Indeed it would seem that the circumstance that the deceased was seen walking on the track, shortly before the arrival of the train that struck him, in the same direction in which it was going has such a tendency alone and by itself. Whilst so walking he is an obstruction on the track and in front of the train that strikes him. Until the train comes in sight of him, he does not appear as such. But in view of the fact that he is finally struck by the train and there is nothing showing that he had ever quit walking in front thereof, it is not unreasonable to infer that he continued to walk until the train did come in sight of him and appear, to wit, as an obstruction. This inference was helped out in those cases by the after circumstances referred to, and it was further helped out by the probabilities. In such a case, there is room for the strongest probability to have an effect.

In the Hackney Case the action of the lower court in peremptorily instructing the jury to find for the defendant was upheld. There the deceased was last seen about 20 minutes after 10 o'clock in the evening, sitting near a post about 10 feet from the track in an intoxicated condition. About 11 o'clock he was found in a path or private road that ran along the main track a short distance down the track from where he was last seen alive, unconscious, with severe wounds upon his

head and shoulders, which resulted in his death in a few hours afterwards. In the meantime a train had passed. There was no evidence that he was on the track or within striking distance of a train at any time. The case was stronger than here, in that no blood was found upon the track or signs that anything had been dragged along it by the train. It might be claimed that it was weaker, in that the body was found off the track and not on it, as the tendency of a train striking a body in front of it is to throw it from the track. It is like it in that there was no evidence that the decedent had been on the track before he was struck. The conclusion of the court is stated in these words:

"The burden was upon the plaintiff to show that the deceased did appear upon the track or was near to it so as to be an obstruction, and, having failed to do this, no prima facie case was made out."

For the reasons stated, we feel constrained to hold that the court erred in refusing to instruct the jury to find for defendant. The judgment is reversed, and case remanded for a new trial and further proceedings consistent herewith.