L. & N. RY. v. W. M. TRACEY, Admr.
and

L. & N. RY. v. J. M. BURGIN, Admr.

Eastern Section.  February —, 1928.

Brown & Johnson and Jackson & Crawford, all of Maryville, and Cox & Johnson, of Knoxville, for plaintiff in error.

Kramer & Kramer, of Maryville, for defendant in error.

OWEN, J. The L. & N. Railroad Company, hereinafter called defendant, has appealed from two judgments rendered against it in the sum of six thousand ($6,000) dollars in favor of W. M. Tracey, administrator of Ernest L. Tracey, and four thousand ($4,000) dollars rendered against it in favor of J. M. Burgin, administrator of John Burgin. The two suits were tried at the same time to the same jury by consent.

Ernest L. Tracey and John Burgin, two young men about twenty-one years of age each, with one W. B. Cannon also a young man, lost their lives in an automobile accident when the automobile in which they were riding and was driven by Cannon, was struck by an engine pulling a long train of freight cars on the tracks of the defendant railroad company near McGhee Station between Maryville and Madisonville and at a crossing where the State Highway No. 33 crosses the defendant railroad. Cannon owned a Dodge roadster car, seated next to him was Tracey and on the right side of the car was Burgin. The railroad track, at this crossing, runs nearly north and south, the highway crosses east and west. The occupants of the automobile were

going west, the train came from the north going south. East of the railroad just prior to the crossing the highway runs nearly parallel with the railroad for a distance of more than one-half mile, the highway being about 270 feet east of the railroad at the one-half mile point but as the highway extends further north of this crossing and east of the railroad the distance between the railroad and highway grows greater or widens.

The declarations in the two cases are practically the same with the exception as to whom the deceased left surviving and for whose benefit the suits were instituted; Tracey's suit being for the benefit of his widow and child while Burgin left no widow but a father and mother. There were four counts to each declaration and in each count it was alleged that the accident was caused by the joint and concurrent negligence of Cannon, the driver of the car, and of the defendant railroad company.

In the first count of these declarations, it is averred that Cannon, who had the control and management of the automobile, carelessly and negligently drove the automobile onto the grade crossing of the railroad company in front of and ahead of one of the trains of the defendant company, which train was at the time being carelessly, recklessly and negligently operated by the agents and employees of the defendant company. There are no specific averments of negligence in this count.

In the second count of the declarations, it is averred that the defendant railroad company failed to observe the statutory precautions as set out in subsections 2 and 4 of section 1574 of Shannon's Code. Violation of subsection 2 was abandoned upon the trial of the cases.

In the third count of the declarations, it is averred that the railroad company was negligent in failing to build and maintain a proper crossing at the place of the accident as required by sections 1593 and 1594a1 of Shannon's Code.

The fourth count of the declarations is based upon common-law negligence, there being four specifications of negligence set out as follows:

(1) In running and operating its said train at an extremely rapid and dangerous rate of speed near and over said dangerous public road crossing.

(2) In failing to sound the bell or whistle or give any other proper notice of the approach of said train to said road crossing.

(3) In failing to make proper effort to warn the driver and occupants of said automobile of their dangerous position on or near the railway tracks of the defendant company.

(4) In failing to exercise a proper degree of care, diligence and caution to avoid striking said automobile and killing said Ernest L. Tracey and John Burgin after the position of danger

of said automobile and its occupants was discovered or should have been discovered by the defendant company or its employees. The defendant filed pleas of not guilty in each case. The accident occurred on the 27th day of October, 1926, the cause was submitted for trial at the February Term, 1928 in the Circuit Court of Blount county. Upon the conclusion of the plaintiff's testimony there was a motion for a directed verdict on all the counts. This motion was sustained as to the third count in each of the declarations and was overruled as to the other three counts. Upon the conclusion of all the testimony the defendant renewed its motion for a directed verdict in each case and this was overruled. After the charge of the court the jury returned separate verdicts for the amounts heretofore stated. The defendant seasonably filed its motion for a new trial containing twenty-four grounds, which motion was overruled, prayed and perfected an appeal to this court and has assigned twenty-six errors, being the same twenty-four grounds mentioned in the motion for a new trial with two additional assignments where it is insisted that the court erred in overruling, disallowing and failing to sustain the defendant's motion for a new trial in these cases and the court erred in writing after the defendant's requests to charge, the statement that the requests were covered in the general charge. These assignments, 24 and 25 are overruled because the 24th assignment is too general and the 25th assignment does not show that the defendant was prejudiced by the language endorsed on the special requests. As to the other twenty-four assignments, we will group them into four groups. In Group 1 we have the first four assignments which complain of the court not directing a verdict for the defendant. Group No. 2 includes assignments five to fifteen which complain of errors in the charge of the Court, these excerpts complained of cover twenty pages of defendant's brief, the charge covers fifty-five pages of the transcript. We will not undertake to set out these various excerpts in full but will consider the same together in passing upon the court's charge. Group No. 3 includes assignments sixteen to twenty-three inclusive and complain of the court's refusal to charge eight special requests offered by the defendant and assignment No. 26 complains of the verdicts being excessive. These cases present a large record of two volumes of 700 pages. The briefs of counsel contain 150 pages. This appeal was ably argued by learned counsels for both parties and we have been furnished with splendid briefs on the questions involved on this appeal. It is insisted, first by the defendant, that whether the common law or statute applies to this particular case, was a question of law for the court, and it was error to submit such a question to the jury, and to charge the jury on both the common law and the statutory counts. The statute is merely declaratory of the common law with the exception that contributory negligence of the injured party,

where the statute is violated, does not bar a recovery and the burden of proof is on the railroad company to show that it has complied with the statutory precautions.

On the day of the accident, Cannon and the two young men who were killed left Maryville about noon in Cannon's automobile expecting to go to Florida where they hoped to find employment. The day prior to the accident Cannon had agreed to take Burgin in Cannon's car and Tracey was to go in his own car but the night before the accident Tracey's car was burned and he applied next morning for a seat in Cannon's car·so all three of these parties left Maryville in the car with one seat and all of them on the same seat. It appears that Cannon and Burgin were familiar with the highway and crossing where the accident occurred, Tracey was not familiar. Tracey and Burgin were both killed almost instantly, Cannon was rendered unconscious but gained consciousness about eight or nine hours after the accident. It appears that this highway over which these young men were traveling is heavily traveled at this particular point. For a mile or two, before reaching the crossing the automobile was going at a rate of twenty-five or thirty miles per hour, it was a little in advance of the freight train, the freight train was running at a rate of thirty to thirty-five miles per hour. The highway east of the railroad after it goes south is down grade, the automobile was going down grade. Just before the highway turns at an angle of forty-six degrees to cross the railroad there is a low place in the highway called a dip some fifty feet east of the railroad. Cannon states that when he reached this dip he slowed down to fifteen or twenty miles an hour then his car had to go up grade until it reached the crossing. There is some proof that between the railroad and the highway there is some shrubbery. Cannon testified that he looked but did not see any train and as he neared the railroad he looked to the left, his car being about ten or twelve feet from the railroad; that the other occupants looked to the right and one of them hollered "Lord, there is a train." Which one made this exclamation Cannon was unable to state. Cannon testified that he could not stop his car and tried his best to get across the railroad but the train struck the automobile. The engineer was on the west side of the engine at his post of duty. This was the opposite side from whence the automobile approached the railroad. The fireman testified that he saw the automobile some distance before they reached the crossing as it was running parallel with the train. He saw the automobile slow down as it reached the dip or low place in the highway. The fireman then turned to some other duty and did not know of·the automobile approaching the railroad track until the accident occurred. He testified that he thought that the automobile was going to stop before it got to the track. The engineer and fireman both testified that the engineer was on the lookout but on account of

the length of the boiler of the engine the engineer could not see the automobile approach the track, when his engine was within eighty or ninety feet of the crossing. Cannon testified that when he got on the railroad track the engine was right on his automobile when the accident happened. There is a conflict in the testimony as to whether or not the engineer blowed for this crossing, the train crew and disinterested witnesses testified that the whistle was blown for the crossing, while Cannon and Mr. and Mrs. Joe Smith, who were near by, testified that the whistle was not blown. Therefore, we find material evidence that the whistle was not blown for this crossing. This train consisted of forty-two cars. The train ran from Corbin, Ky., to Etowah, Tenn. It was a through freight fairly heavily loaded and was from seventeen hundred to eighteen hundred feet in length. The proof shows that at the rate of thirty miles per hour this train was running forty-four feet per second. If the automobile was running twenty miles per hour that would be between twenty-nine and thirty feet per second. The uncontradicted proof shows that this automobile was out of the line of vision of the engineer for more than two seconds before the accident happened or when the engine was ninety feet away during more than two seconds. The automobile at the rate of twenty miles per hour came up from the low place in the highway and onto the track and became an obstruction when the engineer could not see the approaching car. The automobile did not appear within striking distance of the train until the train practically came in contact with the automobile.

It has been held in this State that when an obstruction appears in front of a moving train in such proximity that the statute cannot be observed, it is then a common-law case, and not a statutory case. In other words, the performance of impossibilities in the observance of statutory precautions is not required and where a person appears upon the track in front of the engine or in striking distance of a train so suddenly that a compliance with such precautions is impossible, no liability against the railroad company can be predicated upon the failure to observe such precautions. Railroad v. Swaney, 73 Tenn., 119; Railroad v. Scales, 70 Tenn., 688; Railroad v. Weaver, 3 Shan. Cas., 13; Moran v. Railroad, 61 Tenn., 379; Railroad v. Stone, 54 Tenn., 469; Railroad v. Crews, 118 Tenn., 52; Railroad v. Brinkley, 127 Tenn., 82.

As stated in Railway v. Howard, 90 Tenn., 144, at page 149:

> "It is only when an obstruction appears on its track, or within striking distance of its track, that the statute imposes the requirement of stopping the train by putting on the brakes, reversing the engine, etc."

No duty rests upon the employees of a railroad company to comply with that portion of subsection 4 of section 1574, Shannon's Code,

which requires lookout on engine, the sounding of the whistle, putting down the brakes and doing everything possible to stop the train and prevent the accident until a person, animal or other obstruction appears upon the track in front of a moving train or in striking distance of the train. Preslar v. Railroad, 135 Tenn., 45; Railroad v. Brook, 132 Tenn., 479; Railroad v. Crews, 118 Tenn., 70; Railroad v. Seaborn, 85 Tenn., 391; Railroad v. Howard, 90 Tenn., 149; Railroad v. Reidmond, 79 Tenn., 149; Curtis v. Railroad, 23 Fed., 109; Railroad v. Hawk, 160 Fed., 348.

We are of the opinion that the court was in error in not directing a verdict at the conclusion of all the proof as to the second count and defendant's assignments to this extent are sustained. The next question to be determined is; under the common law counts, whether or not the contributory negligence of the deceased could bar a recovery.

It is insisted that Tracey and Burgin lost their lives by the concurrent negligence of Cannon, the driver of the automobile, and the negligence of the railroad company through its agents and servants. There is evidence that there were some bushes and shrubbery between the highway and the railroad track that obscured the railroad and train from the occupants of the automobile. There is evidence that the train was coasting, that it was going down grade some distance before reaching the crossing and that the train did not make any noise. This was a much traveled highway and automobiles passed over the railroad at this crossing every few minutes. The engineer and fireman were familiar with the heavy traffic at this crossing. The negligence of Cannon, the driver, cannot be imputed to the two men who were killed as they were guests of Cannon. We quote from Cannon's testimony who was a witness for plaintiff, as follows:

"Q. As you went down, when did you first see the train? A. I was I guess in ten foot of the track or something near that.

"Q. Had you looked for the train? A. Right in that little dip there I looked, in that little dip in the curve I looked that way.

"Q. When you say you looked over that way what did you mean by that? A. Well that little curve, that little swag.

Here the witness was shown a diagram on the floor before the jury and he designated a brown line to represent the pike and another line to represent the railroad and he pointed out on this diagram where he was when he looked back towards the north or east for the train. He testified that he looked over towards the track as far behind him as he could. That was in a easterly or northerly direction or to Cannon's right. Then he was asked:

"Q. After you looked back in this easterly direction what did you do? A. Well I went on around, around the curve and then reduced my speed and I guess I was making, I don't know fifteen or twenty miles probably when I went around the curve there and then I was

looking down the other way and there was some blocks down there, I thought I could see those blocks before I got plum around the curve but I couldn't see them till after I got up straight.''

We infer that the witness was speaking about signal blocks that dropped and thus indicated an approaching train.

''Q. You were looking down in the other direction? A. Yes sir, and one of the boys, after I was right on the track almost, one of the boys hollered, 'Lord, there is a train.'

''Q. Do you know which one it was? A. No.

''Q. Had you seen any indication of the train before one of the boys said that? A. No.

''Q. Had you heard any? A. No.

''Q. How close to the track do you think the car was when you heard him holler, ''Lord, there is a train?' A. I was as close as from here to them fellows over there.

''Q. These jurors? A. Yes sir.

''Q. That's a distance of some ten or twelve feet? A. Well I was up on that where you start up grade there on the crossing.

''Q. On that steep grade going up there to the crossing? A. Yes sir.

''Q. Had you been listening as you went along there? A. Well yes I had been listening of course.

''Q. Had any train blown? A. No.

''Q. Had any train rung a bell as you came along there? A. No.

''Q. Neither a whistle or the ringing of a bell? A. No sir.

''Q. What did you do when the boy said, 'Lord, there comes a train? A. I tried to get across the track, it was so close I couldn't stop.

''Q. Why didn't you stop? A. I couldn't stop, too close.

''Q. Too close, you couldn't stop? A. Yes sir.

''Q. And you tried to do what? A. Tried to get across.

''Q. Do you know how close the train was at that time? A. Well, no, not in feet I don't but it was pretty close.

''Q. You don't know just what—just where it was? A. No.

''Q. Now what happened then? A. I don't know what happened.

''Q. You don't know what happened? A. No I don't remember anything after it hit us.''

The witness testified that several hours after the accident he regained consciousness at his mother's home. . . . The witness further testified:

''Q. What obstruction was there, if any Mr. Cannon, between the road down here and the railroad? A. You mean between the highway and the railroad?

"Q. Yes, between the highway and the railroad? A. Well there was a fence row up through there and big trees right there at the curve, big bushy topped trees.

"Q. What if any effect would that fence row and those bushes and the tree have on the view of the railroad along there? A. Well, if a man was down there towards the railroad, down there where I looked around he couldn't see back up there nowheres hardly.

"Q. What kept you from seeing down there—down in here up the railroad? A. Well, I suppose that fence row and those trees.

On cross-examination this witness was asked:

"Q. Suppose it is sixty-eight feet from this curve over to the railroad crossing and after he passed this tree here and after you had passed those little bushes along the fence row there what is there to keep you from seeing a train fourteen feet high coming down there with thirty-eight or forty cars? A. I was looking another way for a train to come that way.

"Q. If you had looked up this way you could have seen it? A. If I had looked after I got around the curve I could have seen it, if I had looked up that way.

"Q. How fast were you going when you looked that way? A. Fifteen or twenty miles an hour.

"Q. Did you get faster or slower as you went on towards the track? A. Yes sir, I seen the train I got faster I suppose.

"Q. And where were you when you saw the train? A. I was right there on the track, up next to the track there.

"Q. When you saw it? A. Yes sir.

"Q. Where were you when one of the boys hollered and told you the train was coming? A. Right there.

"Q. Did you see the train after he hollered? A. Yes sir, after he hollered I turned my head and seen the train.

"Q. And you tried to get over, beat it over? A. Yes sir, I couldn't stop.

"Q. If you had been slower could you have stopped? A. Well of course if I had just been moving along just gradually, barely moving I could have stopped.

"Q. The slowest you had run along there from the time you had started out from the woodland was how slow? A. Well fifteen or twenty miles an hour.

"Q. You never did stop at all? A. No, I didn't stop, there was no sign to stop.

"Q. You didn't take the railroad as a signal at all? A. Yes, I looked for the train.

"Q. You didn't stop, stop the car and look? A. No, I didn't stop.

"Q. Where the Burgin boy was on that side, was he in a better position to see or as good a position to see as you? A. Better, he was on that side (meaning the right side from which the train approached).

"Q. Did you ask him to look out for things on that side of the car? A. No sir.

"Q. Had he been looking out for things on that side? A. I suppose he had.

"Q. In other words after you passed this fence row here you could have seen a train up there a half a mile couldn't you? A. After we got up on the track he could see it a half a mile.

"Q. Couldn't he after he passed this fence over here, along about here, where you were when they hollered, couldn't he see it for half a mile? A. I don't know about half a mile, you could see it for a good little piece, but we were right on the track then."

The witness further testified that when he first saw the train he could not tell how fast it was running or how far away it was, or whether it was a freight or a passenger train, that all he saw was the engine and he didn't hardly guess it was two rail lengths from the crossing when he saw the train.

Counsel for the defendant insist that the defendant is not liable under the common law counts under the proof submitted to the court and jury, that a verdict should have been directed in favor of the defendant that the duty to stop, look or listen for trains at railroad crossings is a positive fixed duty imposed by law upon travelers at public highways, when, by such precautions, a train may be seen or heard. The failure of a traveler to observe such precautions will bar his recovery for damages in cases of injury, if such failure in any manner directly or proximately contributes to the injury.

The courts of the land have in recent years realized the necessity of holding travelers upon the highways to a strict observance of the rule of conduct imposed upon them by law in the matter of crossing railroad tracks at grade. The universal use of automobiles upon the public highways, the reckless rate of speed at which they are driven, the murderous contempt and disregard of all regulations prescribed for the safety of travelers, has caused the courts to demand strict observance of this duty to stop, look or listen before recovery of damages will be allowed for injuries sustained by coming into collision with railroad trains.

The Supreme Court of the United States, has in an opinion handed down October 31, 1927, in the case of Railroad v. Goodman, hereinafter cited and discussed, announced "Once for all" what they were pleased ot call a "standard of conduct" for travelers upon a highway, and there ruled that the driver of an automobile must stop and get out of his car and look or listen where, by so doing, he may observe or hear the approach of an on-coming train toward the crossing.

Railroad v. Maidment, 168 Fed., 21, 21 L. R. A., 794; Bradley v. Railroad, 288 Fed., 484; Railroad v. Goodman, 275 U. S., 66, 72 L. Ed., 167, reversing holding in 10 Fed. (2d), 58).

On the other hand we find the authorities in announcing the common-law duty of a railroad company to be supported by the following authorities:

In 22 R. C. L., page 952, the general rule of law is stated to be that,
"It is clearly the duty of a railroad company at common law to give notice of the approach of trains at all points of known or reasonably apprehended danger. And failure to do so will render the company liable where such failure was the proximate cause of injury to one not guilty of contributory negligence."

It is said in Coal, Iron & Ry. Co. v. Minton, 117 Tenn., 415, that:
"The question of plaintiff's contributory negligence as affecting his right of recovery for personal injuries is proper to be submitted to the determination of the jury under the evidence."

In discussing the question of negligence and contributory negligence, in the case of Railroad v. Wade, 127 Tenn., 154, page 158, the Supreme Court said:
"Ordinary care is that degree of care which a person of reasonable prudence would exercise under a given state of facts appearing in the evidence in a cause, or in a state of facts similar thereto. This ordinary care may be positive or negative; that is, it may consist of what a person of reasonable prudence would have done under the same or similar circumstances, or of refraining from doing what he would have refrained from doing under these circumstances. What a person of reasonable prudence would have done under the same or similar circumstances must be determined by the jury from their knowledge of mankind, and of how persons of reasonable prudence usually deport themselves in relation to their surroundings."

In the case of Roofing & Manufacturing Co. v. Black, 129 Tenn., 30, pages 36-37, where the question of contributory negligence was the point to which the attention of the court was directly drawn, it was said:
"The question of contributory negligence, as well as the question of negligence, is ordinarily for the jury. Even though the facts be undisputed, if intelligent minds might draw different conclusions as to whether, under the circumstances conceded, the conduct of a plaintiff was that of an ordinarily prudent man, the matter should be left to the jury. The court should draw no inference when in doubt, but only in those cases where the evidence is without material conflict, and such that all reasonable men must reach the same conclusion therefrom. It is only in cases where the evidence is susceptible of no other fair inference

that the court is justified in instructing the jury, as a matter of law, that the plaintiff has been guilty of contributory negligence which would bar his recovery.''

In Berry on Automobiles, sec. 571, page 512 (4 Ed.), we find the following statement of the rule now under discussion:

"The extent to which one in the position of a guest should appreciate an impending peril, and act in relation thereto, depends upon the facts peculiar in each case. Unless these are manifest and the inferences to be drawn therefrom clear beyond peradventure, the issues involved must be submitted to the jury for determination."

In Blashfield's Cyclopedia of Automobile Law, Volume 2, page 1133, we find the following:

"Unless the facts are manifest and the inference to be drawn therefrom clear beyond peradventure, the question whether the guest of an automobile driver, having no control over him was negligent in failing to appreciate the danger in crossing railroad tracks, or to act in relation thereto, must be submitted to the jury."

In the case of Dedman v. Dedman, 155 Tenn., 241, page 246, it is said:

"One riding in an automobile as a guest cannot rely upon the care and negligence of the driver to the extent of relieving himself from the exercise of reasonable precautions for his own safety. This obligation is personal and continuing. Stem v. Interurban Ry., 142 Tenn., 494. A guest, although not driving the car, must exercise due care for his own safety. Hurt v. Y. & M. V. R. Co., 140 Tenn., 623. If an adult, while riding in a car driven by another sees, or ought by due diligence to see, that the driver is not taking proper precautions; it is the duty of the passenger or guest to remonstrate or give some warning of danger, and a failure to do so is negligence. Knoxville Railway & Light Co. v. Van Gilder, 132 Tenn., 489. To the same effect is Tennessee Central R. Co. v. Van Hoy, 143 Tenn., 312.

In Railroad v. Ross et al., 2 Tenn. App., 384, page 393, this court said:

"In situations as presented in the instant case, where the crossings are much frequented and are dangerous, the traveller's view being obstructed until he is almost upon the track and where the train approaches at a rapid rate of speed, noiselessly and without giving notice of its approach, under these circumstances, those operating the train should have reasonable apprehension that a traveller would be likely to approach the track at such crossings without knowledge of the train's approach; but, the question of

whether the traveller's approach under such circumstances indicated that a collision was imminent is one for the jury.''

''The point is, that if danger might be reasonably apprehended under the circumstances, it was the duty of the company to give some notice or warning in order that a collision may be avoided. Where there is no reasonable apprehension of danger, no notice is required. But if danger to the person or property of others may be reasonably apprehended, or is likely to result from the running of its trains without giving such notice, then it is the duty of the company to give warning and its omission is negligence. See 2 Thompson on Negligence, secs. 1596-1597.''

In the case of Railroad v. Sawyer, 114 Tenn., 84, page 99, it is said:

''After an examination of all the authorities cited, we think the true rule deducible therefrom is that, if the place is dangerous, then the company is onerated with the duty of warning travelers on the highway of the approach of its trains, but whether the place, as a matter of fact, is dangerous, is a question for the determination of the jury.''

In the case of Chicago Rapid Transit Company v. Walton, 105 Tenn., 414, page 427, wherein objection was made because the trial judge had charged on the question of common-law negligence, it is said:

''A charge upon this feature was proper, as there was evidence tending to show that there were obstructions to the view along the line of the road to within a short distance of this crossing, and that the train was being driven at a high rate of speed. Upon this latter point there is a conflict of statement, but the conflict is more apparent than real, as the facts stated in regard to the distance to be traversed by the train within a given time, and the number of stops to be made in that time show that the speed of the train was about forty-five' miles an hour.

''The question we are now considering is not whether the rate of speed was in fact reckless, but, is there evidence which would justify the court in submitting the question of common law negligence to the jury? If so, the jury must look to all the circumstances, the situation of the parties, the topography of the premises, the obstructions near the track, and from all these and other circumstances determine the question whether the road exercised the proper care and caution in running the train at the time and place of the accident.''

In the fourth count of the declaration, it is averred that the defendant was operating its train at an extremely rapid and dangerous rate of speed near and over said dangerous public road crossing.

In the case of Stem v. Interurban Railway, 142 Tenn., 494, pages 507-508, it is said:

"It is alleged in the common-law count of the declaration that the defendant was operating its car over an exceedingly dangerous crossing at a high and excessive rate of speed. This allegation, supported by proof, presents a question of fact to be determined by the jury.

. . . . . .

"We, of course, do not mean to say that liability can be based upon rate of speed alone, but in connection with the allegations of a dangerous crossing, unless there is an absence of substantiating proof, which is not the case here, it does not lie within the province of the court to determine the question."

Counsel for the defendant also relies upon the case of Graves v. Railroad, 126 Tenn., page 150, in which case it was held that railroads were not required to sound a whistle or bell at public crossings not designated by statutory sign. The Graves case was referred to in Stem v. Interurban, supra, as follows:

"The case of Graves v. Railroad, supra, is no authority for, nor can it be construed to authorize, the assumption that a compliance with statutory warning signals at crossings is the full measure of a railroad's obligation at such places. The scope of that decision is emphatically limited by the language employed to the duties of railroads with respect to the statutory warnings to be employed. In the opinion it is nowhere intimated that other or different negligence than that of a failure to give statutory notice of the approach of cars at crossings may not exist under given circumstances. This has been repeatedly held."

The court, in the Stem case, announces the following rule:

"In an action for the death in an automobile in a crossing accident, deceased's contributory negligence held a question for the jury.

"NEGLIGENCE. Railroads. Automobile driver's negligence not imputed to guest, but guest cannot rely on driver's vigilance.

"Negligence of automobile driver cannot be imputed to his guest, but guest cannot rely upon the care and vigilance of driver to extent of relieving himself from the exercise of reasonable precautions for his own safety at a crossing.

"RAILROADS. When traveler is required to look and listen at crossings.

"To look and listen for cars at crossings is a positive fixed duty when by such precautions they may be seen or heard, and in such cases a failure of observance will bar recovery, but where, because of conditions not created by or under the control of a traveler, to look and listen will not apprise him of danger, he may be excused from so doing."

The statutory precautions do not exceed the common-law obligation of diligence and care. The statutes are not the full measure of the railroad's duty. Railroad Company v. Ross, 2 Tenn. App., 384. In Railroad v. Ross, it was further held:

"The point is, that if danger might be reasonably apprehended under the circumstances, it was the duty of the company to give some notice or warning in order that a collision may be avoided. Where there is no reasonable apprehension of danger, no person or property of others may be reasonably apprehended, or is likely to result from the running of its trains without giving such notice, then it is the duty of the company to give warning and its omission is negligence."

The defendant also relies on the cases of Railroad v. Page, 153 Tenn., 84, which is a case based upon liability under the statute, and Crawford v. Railroad, 153 Tenn., 642. In the Crawford case, suit was brought by the administrator to recover for his intestate who was killed in a collision by a train on a public crossing, while she was riding on the rear seat of an automobile as a guest of J. H. Armstrong, in that case our Supreme Court held that the negligence of the driver of the automobile could not be imputed to his guest. The trial judge held in directing a verdict for the defendant that the nonobservance of the Acts of 1927, requiring the driver of an automobile before crossing a railroad to bring his car to a stop and look and listen, was negligence per se, and if this act was the proximate cause of the collision it would bar a recovery, in the action by the administrator of Mrs. Crawford.

The Supreme Court, in reversing the trial court was of the opinion and so held that the question of proximate cause, under the common-law count should be left to the jury under the authorities in Tennessee.

We are of the opinion that the trial judge was not in error in submitting the instant case to the jury on the first and fourth counts and to this extent the defendant's assignments of error are overruled and disallowed. As to the second and third groups of assignments, the court was in error in charging that the jury could find the defendant guilty under the statutory count. These assignments are sustained in part. The fifth assignment is sustained. That assignment complains of the court instructing the jury in their duty to weigh the evidence of, "Men skilled and experienced in certain professions, such as engineering, civil engineering or mechanical engineering." No expert witness testified in the instant case as an expert witness and it is insisted by the language of the court that it was prejudicial to the defendant when the jury came to considering the evidence of the defendant's engineer in charge of the locomotive and who testified for the defendant.

We are of the opinion that this portion of the court's charge was improper, had no bearing on the instant case and the fifth assignment is sustained.

All of the assignments complaining of the court's charge in regard to the defendant's duty under the statute are sustained, these judgments will be reversed and the cause remanded for a new trial under the common law counts and the court will charge in the future trial the plaintiff's and defendant's duty toward each other under the common law. The various special requests become immaterial as we now view the case and likewise, the amounts reported in the verdicts; it is not necessary to pass upon the question, whether or not these verdicts are excessive.

The judgment of the lower court is reversed and the cause remanded for a new trial. The defendant will recover of the plaintiffs the costs of the appeal. The costs of the lower court will abide by the final judgment.

Heiskell and Senter, JJ., concur.