## METROPOLITAN LIFE INS. CO. v. HOCH.
### No. 7404.

Circuit Court of Appeals, Sixth Circuit.

Feb. 11, 1938.

C. R. Banker and Lee H. Schminck, both of Toledo, Ohio (Holbrook & Banker, of Toledo, Ohio, on the brief), for appellant.

R. O. Holloway, of Toledo, Ohio (Holloway, Peppers & Romanoff, of Toledo, Ohio, on the brief), for appellee.

Before MOORMAN and HICKS, Circuit Judges, and SWINFORD, District Judge.

HICKS, Circuit Judge.

Suit by Arabella Hoch, widow of Forrest E. Hoch, to recover the sums of $5,000 and $1,252.50, being respectively the amount of an accident policy and the coverage of a double indemnity provision in a life insurance policy, both issued by appellant, Metropolitan Life Insurance Company, upon the life of the deceased.

The accident policy insured "against the results of bodily injuries * * * caused directly and independently of all other causes by violent and accidental means. * * *" The accidental death benefit clause in the life insurance policy insured against death "as the result directly and independently of all other causes, of bodily injuries sustained through external, violent and accidental means. * * *"

Appellee had verdict and judgment upon both policies, and appellant challenges the denial of a directed verdict.

The deceased, thirty-seven years old, a salesman and in good health, lived with his family in West Toledo. On Saturday night, February 25, 1933, he, with Mrs. Hoch, her mother and two children, drove in an automobile to a sister's house on Corinth street. They had a few highballs, the men playing checkers; and left about midnight, leaving one daughter at the sister's. On the return trip the deceased was driving and Mrs. Hoch sat with him. Instead of returning directly home he suggested that they take a ride and drove along various streets of the city. It was snowing, but his wife testified that he was sober and drove carefully. He finally started directly away from home and Mrs. Hoch told him that if he did not go home she would get out. He said "all right." She then turned off the ignition and with her mother and daughter got out of the car and went home.

At 2:30 a. m. on Sunday, the 26th, deceased pounded on the door of Arthur Ames, a farmer living near the junction of Seaman and Teachout roads. Ames let him in and he stayed about ten minutes. He said his family was in the machine and were freezing to death. He afterwards explained that his machine was stuck. He smelled of alcohol, but he was rational and apologized to Ames for disturbing him and went away. There were then no indications that he was injured in any way. This was the last time he was seen alive.

Route No. 2 (Jerusalem road) is the main highway between Toledo and Cleveland and runs east and west through the settlement known as Bono. A half mile west of Bono is Litton's filling station; and a half mile farther west the road bridges a creek; and a half mile still farther west is Teachout road, which runs north and south. A half mile north of route 2 and parallel to it is Sacks road, which intersects Teachout. A mile north of route 2 and parallel to it is Seaman road, which likewise intersects Teachout. From near the bridge a canal or creek extends due north about a mile, or nearly to Seaman, if it should be projected east of Teachout. There was a ditch running from near Seaman and Teachout east about half a mile and connecting with the canal. Another ditch extended from a point, where Sacks joins Teachout, across the intervening tract to the canal. There was a third ditch running east and emptying into the canal about five or six hundred feet north of route 2.

On Sunday morning deceased's car was found stalled in the frozen mud, on the side of the road, near the Ames home at the junction of Teachout and Seaman. The indications were that the wheels had been churning. The lights of Litton's filling station, about a mile and a half away, could be seen from this point. About 10 a. m. the next day, Monday, the deceased's body was found a few feet north of the last-mentioned ditch and west of the canal. He was lying face down with his forearms under his body; he was bareheaded and minus his coat, vest, and overcoat. His shirt was torn badly on the back and on the left sleeve, and the right sleeve was muddy. His trousers were rumpled and his shoes were splattered. The photograph in evidence indicates that the garter on his left leg was loose and dragging and that on his right

was down and just above his ankle. His rimless glasses were not broken but the right bow had come loose from his ear so that the glasses hung at an angle across his face in such a way that the right glass was in his mouth. There were scratches on his face and arms and an abrasion on his forehead, but no swelling. The body was frozen. He was lying more nearly on his right side with his head toward the north and his feet toward the Bono road. His hat was two or three feet from his head toward the northeast and his vest was lying a foot or so from the hat. It was not folded but was "bunched up."

The point where the body was found was from a mile to a mile and a half from the car. Some of the intervening country was swampy and marshy and there was marsh grass at the point where the body was found. This grass had fallen and it was matted and it was difficult to walk over. The canal had banks averaging ten or twelve feet high and where the ditches cut through the dike the banks were sharp and precipitous. There were brush and weeds along these banks. On the day after the body was found the decedent's overcoat was found on top of the dike or embankment of the canal and three or four hundred feet from the body. His scarf was found nearby with one end lying in the water of the canal.

At 1 a. m. on Sunday morning the temperature was 33 degrees. It was 30 degrees from 5 a. m. to 9 a. m., rose to 38 degrees at 4 p. m. and by midnight it had dropped to 28. At 3, 4, and 5 a. m. on Monday it reached a low of 25, rose to 26 at 6 a. m., but dropped to 25 at 7 and 8 a. m. Between 10 and 11 a. m. when the body was found, it ranged upwardly from 31 to 34 degrees.

The autopsy disclosed no organic disease and no marked intoxication. However, Dr. Hohly, a witness for appellee testified: "He had a dilated right heart and a terminal oedema of the lungs. Terminal oedema of the lungs is the presence of fluid that occurs in the lungs before death. No, I don't think exposure to cold would do a thing like that. I think the terminal oedema was caused by the dilated right side of the heart. That is caused by exercise over and above the capacity of the heart—strain on the heart over and above the capacity of the

heart. Athletes have it. It is due to the fact that more blood is required than ordinarily. The right side of the heart sends blood to the lungs to be aerated. When an athlete is engaged in a race he temporarily has dilation of the heart. It is not a disease. It is something that comes and goes, depending on exertion. By 'terminal' we mean that which happens before death. This mucus or serum accumulates in the lungs before death. *. * *"

We think appellant was entitled to a directed verdict. Appellee's theory is that the deceased while on his way from the car to Litton's filling station for help was, because of some mishap, or slip, thrown so violently to the ground that he was disabled and that in this condition he froze to death. There is evidence that he fell rather than that he laid down voluntarily. This is indicated by the abrasion on his forehead and somewhat by the condition of his glasses. It is true that his surroundings were conducive to an accident, but there is no substantial evidence that such had happened. There is nothing more than a probability that his fall was caused by slipping or stumbling independent of all other causes. There was no disturbance of the grass to indicate that he had been tripped. We are left to conjecture and surmise. He may have slipped, but there is as great if not greater probability that his fall was due to exhaustion or overexertion. The night was dark and cold and he was unacquainted with the difficult route which he had chosen. But probabilities may not take the place of evidence. We think that appellee failed to establish her case by any evidence of a substantial character. See Atchison, T. & S. F. Ry. Co. v. Saxon, 284 U.S. 458, 52 S.Ct. 229, 76 L.Ed. 397; Virginia & S. W. Ry. Co. v. Hawk, 6 Cir., 160 F. 348; Hardy & Burlingham Min. Co. v. Baker, 6 Cir., 10 F.2d 277; Davlin v. Henry Ford & Son, 6 Cir., 20 F.2d 317, 318; Wallace v. Standard Acc. Ins. Co., 6 Cir., 63 F.2d 211.

The judgment is reversed and the case remanded for a new trial.

MOORMAN, Circuit Judge, concurred in the decision of this case, but died before the opinion was prepared.